IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| UNITED STATES OF AMERICA ) <br> ex rel ANGELA CEDEROTH, ) <br> ) <br> Plaintiffs, ) <br> ) <br> CRC HEALTH CORPORATION, ) <br> COMPREHENSIVE ADDICTION ) <br> PROGRAMS, INC., and ) <br> CRC HEALTH TENNESSEE, INC., ) <br> ) <br> Defendants. ) | No. <br> JURY DEMAND <br> FILED UNDER SEAL |

## COMPLAINT OF QUI TAM PLAINTIFF

**I. Introduction**

1. This is an action to recover damages and civil penalties on behalf of the United States of America and the State of Tennessee arising from false and/or fraudulent statements, records and claims made and caused to be made on behalf of CRC Health Corporation, Comprehensive Addiction Programs, Inc. and CRC Health Tennessee, Inc. (referred to jointly hereinafter as "CRC" or "Defendants") and/or their subsidiaries, agents, and employees in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729 et seq., the Tennessee False Claims Act, Tenn. Code Ann §§ 4-18-101 et seq., and the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-183 et seq.

2. This case involves Defendants' pursuit of Medicaid/TennCare and child welfare payments from the governments of the State of Tennessee and the Federal Government through creative and outright fraudulent record keeping and claims submissions originating in Defendants' facility known as New Life Lodge located in Burns, Tennessee. Defendants have knowingly claimed and received payments to which they were not entitled.

3. As a direct and intended result of Defendants' improper practices, the United States of America and the State of Tennessee have made payments, through their contributions to the State of Tennessee TennCare program and Department of Children's Services. It has been estimated that Defendants receive up to ten million dollars ($10,000,000.00) each year from the State and federal governments.

## II. Background of The False Claims Act

4. The federal False Claims Act was originally enacted during the Civil War. Congress substantially amended the Act in 1986 and again in 2009 to enhance the ability of the United States Government ("the Government") to recover losses sustained as the result of fraud against the United States after finding that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combatting government fraud, was in need of modernization. Congress intended that the amendments create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

5. The Act provides that any person who knowingly submits, or causes the submission of, a false or fraudulent claim to the Government for payment or approval, or who retains a payment after discovery or knowledge that it is improper, is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Government. Liability attaches when a defendant "knowingly" seeks payment, or causes others to seek payment, from the Government that is unwarranted. Requisite "knowledge" can include not only actual knowledge as to the impropriety or ineligibility for federal payment of the claim

or information but also acts taken in deliberate ignorance or in reckless disregard of the truth or falsity of such claim or information.

6. The Act allows any person having knowledge about a false or fraudulent claim against the Government to share in any recovery and to recover reasonable costs, expenses and attorney fees from the defendant if the action is successful. The Act requires that the complaint be filed under seal for a minimum of sixty (60) days without service on the defendant to allow the Government time to conduct its own investigation and to determine whether to join the suit.

**III. Tennessee False Claims Act and Tennessee Medicaid False Claims Act**

7. The State of Tennessee has also enacted statutes to combat fraud and abuse. Tenn. Code Ann. §§ 4-18-101 et seq. sets forth the Tennessee False Claims Act. The Tennessee Medicaid False Claims Act ("the TMFCA") specifically targets false claims related to Tennessee's incarnation of the Medicaid program, commonly known and specifically referenced in the statute as TennCare. These acts largely mirror the federal law and seek to facilitate recovery of losses sustained as the result of fraud against the State of Tennessee. The TMFCA specifically targets recovery of funds associated with rampant fraud in the TennCare program. The State of Tennessee General Assembly intended that these Acts track the federal legislation and that they create incentives for individuals with knowledge of fraud against the State to disclose the information without fear of reprisals or State inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the State's behalf.

8. The State Acts provide that any person who knowingly submits, or causes the submission of, a false or fraudulent claim to the State for payment or approval is liable for a civil penalty of up to $25,000 for each such claim, plus three times the amount of the damages sustained by the State. Liability attaches when a defendant "knowingly" seeks payment, causes

others to seek payment or retains payment from the State that is unwarranted. Requisite "knowledge" can include not only actual knowledge as to the impropriety or ineligibility for State payment of the claim or information but also acts taken in deliberate ignorance or in reckless disregard of the truth or falsity of such claim or information.

9. The State Acts allow any person having knowledge about a false or fraudulent claim against the State to share in any recovery and to recover reasonable costs, expenses and attorney fees from the defendant if the action is successful. The State Acts require that the complaint be filed under seal for a minimum of sixty (60) days without service on the defendant to allow the State time to conduct its own investigation and to determine whether to join the suit.

**IV. Parties**

10. Plaintiff/relator Mary Cederoth (hereinafter "Cederoth") is a resident of Burns, Tennessee. From March, 2007 through June, 2011, Cederoth worked in CRC's financial division located at the New Life Lodge in Burns, Tennessee. For a short time in May, 2011, Cederoth filled in for the controller of New Life Lodge. Throughout her employment with CRC, Cederoth learned of substandard patient treatment at New Life Lodge, and of sloppy and fraudulent bookkeeping practices. As her employment continued, she realized that CRC was presenting patently false billing to the State of Tennessee's Departments of TennCare and Children's Services. She further learned that CRC was receiving funds from the State of Tennessee's Department of Children's Services ("DCS") for services for minors that were either not provided at all, or that were provided improperly and in violation of the Department's requirements. She resigned her position in June, 2011 in substantial part because of her discomfort with that misconduct and with the overall atmosphere of poor patient care created by CRC's focus on profits at all costs.

11. CRC Health Corporation is America's largest operator of drug and alcohol treatment and rehabilitation facilities and related services. CRC Health Corporation is the sole shareholder of Comprehensive Addiction Programs, Inc. Comprehensive Addiction Programs, Inc. is the sole shareholder of CRC Health Tennessee, Inc. As of May, 2011, CRC operated well over 100 treatment programs or facilities throughout the United States, according to its federal form 10-K submitted to the Securities and Exchange Commission. CRC Health Corporation is a publicly traded company. Both CRC Health Corporation and Comprehensive Addiction Programs, Inc. are incorporated under the laws of the State of Delaware and have a principal place of business at 20400 Stevens Creek Blvd., Ste. 600, Cupertino, California 95014. CRC Health Corporation and Comprehensive Addiction Programs, Inc. both have a registered agent for service of process with National Registered Agents, Inc. at 160 Greentree Drive, Suite 101, Dover, Delaware 19904.

12. CRC Health Tennessee, Inc. is incorporated in Tennessee with a principal place of business located at 20400 Stevens Creek Blvd., Ste. 600, Cupertino, California 95014 and a registered agent for service of process located at National Registered Agents, Inc., 2300 Hillsboro Road, Ste. 305, Nashville, TN 37212. CRC Health Tennessee, Inc. owns and operates CRC's facilities in the State of Tennessee, including the New Life Lodge in Burns, Tennessee.

**V. Jurisdiction and Venue**

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367 and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint. Relator, moreover, qualifies under that section of the federal

and State of Tennessee False Claims Acts, and Tennessee Medicaid False Claims Act, as an "original source" of the allegations in this Complaint even had such a disclosure taken place.

14. This Court has personal jurisdiction and venue over the Defendants pursuant to 28 U.S.C. §§ 1391(b) and 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because Defendants have had sufficient minimum contacts with the United States and the Middle District of Tennessee, Defendants avail themselves of this jurisdiction and conduct business in the Middle District of Tennessee.

15. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because one or more of the Defendants can be found and transacts business in this District. At all times relevant to this Complaint, all Defendants conducted regular, substantial business within the Middle District of Tennessee. In addition, the statutory violations and fraudulent conduct alleged herein took place in this District.

**VI. Medicaid/TennCare Program Background**

16. Title XIX of the Social Security Act ("the Medicaid Act") authorizes federal grants to the States for Medicaid programs to provide medical assistance to persons with limited income and resources. Medicaid programs are administered by states in accordance with federal regulations. State Medicaid agencies conduct their programs according to a plan approved by the Center for Medicare/Medicaid Servies ("CMS"). To carry out the mandates of the Medicaid program, the State agency pays providers for medical care and services provided to eligible Medicaid recipients. Providers that wish to participate in the Mediciad program must agree to comply with certain requirements specified in a provider agreement.

17. Beginning in January, 1994, the State of Tennessee began administering its Medicaid program under the auspices of a new program known as "TennCare". The TennCare

model sought to provide access to affordable healthcare to Tennesseans while managing the cost of the administration of the program to the State. TennCare largely replaced Medicaid's traditional fee for service approach to funding with a managed care program. The United States Department of Health and Human Services granted the state a five (5) year waiver to demonstrate the TennCare program, and the waiver has been extended to allow the State of Tennessee to administer its Medicaid program (and, importantly, funds) through the TennCare program.

18. Payments due for provision of eligible services are subject to the prompt payment provisions of the Tennessee Code, codified at Tenn. Code Ann. § 56-32-126. Essentially, this law requires HMOs operating under the auspices of TennCare to pay providers within thirty (30) days of the receipt of a claim, absent other unusual circumstances.

19. While TennCare is administered by the State, it is jointly financed by the State and Federal governments. The Federal Government pays its share of medical assistance expenditures to the State, usually on a quarterly basis according to statements of expenditures submitted by the State and a formula used to calculate how much of the total reported expenditures the Federal Government will reimburse the State. The State pays its share of medical assistance expenditures from state and local government funds.

20. Different levels of federal funding are provided to different states, depending on need. The minimum federal matching rate share is fifty percent (50%) of total program costs. The precise level of funding for each state is calculated by the federal government each federal fiscal year. In Tennessee, the annual federal share of TennCare expenditures during the period relevant to this Complaint was approximately seventy-five percent (75%) of total program costs.

**VII. TennCare Rules, Regulations and Provider Agreements**

21. Behavioral health (and other) medical services and payments under TennCare are governed by statutes, rules and regulations, and Provider Agreements between the Managed Care Organizations ("MCOs") and/or Health Maintenance Organizations ("HMOs") authorized to administer TennCare and the Providers with whom the MCOs/HMOs contract to provide services.

22. All providers of TennCare medical services are required to meet and follow certain guidelines and requirements. These requirements include, but are not limited to, the following:

a. valid accreditation;

b. appropriate record keeping that reflects all aspects of patient care at the location where services are provided;

c. making financial and clinical records available for review by government and MCO utilization review auditors;

d. provision of care pursuant to nationally recognized standards of care by individuals with licensures commensurate with the provision of such care;

e. conformity with Provider Agreements regarding level of care, authorization for services, and provision of services;

23. Under TennCare, in the area of behavioral health, providers must receive preauthorization and concurrent authorization for almost all services rendered. Absence of authorization for services can, and often does, result in nonpayment to providers. Preauthorization is typically obtained by reporting clinical information sufficient to establish and certify the medical necessity of the service for which authorization is sought on a form, which is then provided to the MCO/HMO. The form must be executed certifying the veracity of its

contents. The MCO/HMO then reviews the information as provided and, if medical necessity is established, preauthorizes treatment by certifying medical necessity or, if medical necessity is not established, refuses authorization outright or requests additional documentation. Providers may engage in appeals of authorization decisions by having a qualified medical professional directly challenge adverse determinations of medical necessity.

24. In the context of behavioral health, services and reimbursement rates vary based on the level of medical necessity of an individual patient. For instance, one patient may need monitoring for acute Detoxification, while another patient may only need Intensive Outpatient services. Providers are generally reimbursed at a higher rate for higher levels of acuity because services increase with acuity.

25. Obviously, Providers are only entitled to reimbursement for the actual care provided. For instance, if a patient is authorized for care up to detoxification, but the provider only provides rehabilitative services, the provider is only authorized to accept payment for the level of care provided.

26. In the context of behavioral health, concurrent authorization review is common. Concurrent authorization involves a review by the MCO or HMO of the then existing clinical information, communicated by the Provider, to determine whether ongoing treatment is medically necessary. For instance, the MCO might review the information and determine that a patient who is receiving detoxification services no longer needs that level of care, and withdraw authorization for that level of care.

27. Providers are further required to report when an eligible recipient is no longer receiving authorized care to insure that the Provider does not receive payment for services it does not provide. For instance, if a patient dies during treatment, or leaves against medical advice

("AMA"), before the certified period of authorization has elapsed, the Provider must report that information to the MCO and can claim payment only for the period of time for which the TennCare recipient actually received care.

## VIII. The Tennessee Department of Children's Services and CRC

28. The Tennessee Department of Children's Services ("DCS") is Tennessee's public child welfare agency, tasked with the responsibility of protecting and caring for Tennessee's most vulnerable youth.

29. DCS administers funds provided by the State of Tennessee that are largely matched by the federal government.

30. Over the past several years, DCS has contracted with Defendants to provide drug and alcohol rehabilitation services to youth in the custody of DCS who suffer from drug addition, alcoholism or other substance abuse issues.

31. DCS provides payment to CRC for rehabilitation services based on a capitated rate pursuant to its contract with CRC.

32. Unlike the TennCare payment system, CRC's payments from DCS did not depend on medical necessity determinations. Rather, CRC's contract with DCS provided a set rate per patient per day of treatment. Upon information and belief, CRC's contract with DCS capped services at 40 licensed beds for youth treatment through 2010 and 84 licensed beds in 2011, for a maximum yearly compensation of three million dollars ($3,000,000.00). Upon information and belief, the yearly dollar cap was raised by amendment to CRC's contract with DCS.

33. DCS's contract with CRC provides for provision of certain core services by qualified, licensed professionals employed by CRC at its treatment facility in Burns, Tennessee known as New Life Lodge.

## IX. Specific Misconduct by Defendants

### A. Failure to Provide Services

34. Defendants billed, and received payment from, TennCare and the Department of Children's Services for services that they did not provide.

35. Specifically, Defendants certified that care was being provided in licensed beds, but Defendants often had more patients than they had licensed beds, but billed all patients as being placed in a licensed bed. Patients were often kept in unlicensed cots in hallways or on sofas when Defendants certified to TennCare and its MCOs/HMOs and DCS that the patients were in licensed beds, and billed accordingly.

36. Defendants certified that they provided counseling services to patients that they did not provide. For instance, Defendants certified that their rehabilitation program included clinical counseling provided by licensed counselors, but these services were often provided by technicians who were not licensed to provide such services, or the services were simply not provided at all.

37. Defendants certified that they were providing appropriate care under appropriate medical supervision, but no such supervision existed. For periods of time, New Life Lodge had no medical director or even a registered nurse to serve as director of nursing. General staffing levels were inadequate to provide the levels of care Defendants certified that they were providing, forcing clinicians to carry patient loads that far exceeded the standard of care. As further example, the Director of the Adolescent Program was wholly unqualified, claiming a fictitious master's degree, but only held a high school diploma. The Director of the Adult program lacked credentials for a period of time.

38. Defendants billed MCOs/HMOs, and through them TennCare, for patients who had been discharged. Typically, if a patient left early against medical advice, but had been pre-certified for additional days, Defendants would submit a claim for the entire period that had been certified, even though the patient did not receive care for the entire period. Similarly, DCS youth often left the facility for periods of several days on trial home visits, but CRC continued to include absent youth on its daily census for compensation from DCS.

39. Defendants created a program it marketed as "Extended Care" as if it were a licensed, long term residential program. This program targeted patients who had exhausted approved long term, inpatient rehabilitation coverage under TennCare. This program was never disclosed to TennCare or its HMOs/MCOs and Defendants billed TennCare under a variety of care categories, including "intensive outpatient" or "partial hospitalization." Defendants' "Extended Care" did not meet the definitions and requirements detailed for the level of care Defendants billed TennCare. Indeed, Defendants' misled TennCare and its HMOs/MCOs to believe that services were provided onsite at New Life Lodge, when the Extended Care Program was housed off site at a facility that was not licensed to provide any healthcare or rehabilitative services, or even to perform business operations at all. Rather, Extended Care was little more than a halfway house for which Defendants received unauthorized TennCare reimbursement.

40. Defendants billed for levels of care that patients were not receiving. For instance, if a patient was preauthorized to receive detoxification for five (5) days, but Defendants transferred the patient to rehabilitation services after three (3) days, Defendants would bill for detoxification for the entire five (5) day period.

41. Generally speaking, Defendants claims to TennCare MCOs and HMOs tracked the level of authorization regardless of the level of care provided. As one executive ordered, "if it is certed, bill it."

### B. Illicit Authorizations

42. Defendants obtained illicit preauthorization and concurrent review authorization for care. The information Defendants included in their Certificates of Medical Necessity were not based on actual clinical information because the utilization department did not communicate with the clinicians, or communicated with individuals who were not qualified to issue clinical opinions as described above.

43. Defendants routinely changed their internal records to reflect that patients had received care on dates that they had not, in order to match the dates for which care was sought or approved.

44. Defendants improperly sought reimbursement for patients who required acute care, even though its facility was only licensed to provide subacute care. Defendants received their highest level of compensation for detoxification services. Therefore, Defendants certified patients as requiring only subacute detoxification when acute care was clinically appropriate. Such authorization submissions were false, and may have resulted in the deaths of patients.

### C. Fraudulent Accreditation

45. Defendant's authorization to claim and receive reimbursement is predicated on its accreditation by the Commission of Accreditation of Rehabilitation Facilities ("CARF"). CARF accredits alcohol and drug treatment facilities based on standards that are nationally recognized to insure proper patient safety and patient care.

46. CARF bases its accreditation, in part, on site visits to facilities seeking accreditation.

47. Defendants misrepresented the care and protection they provided to patients to CARF. Specifically, Defendants changed the information in patient charts to reflect appropriate levels of care it had not provided. More alarmingly, Defendants went so far as to actively hide charts from CARF auditors. On one occasion, Defendants learned auditors were visiting the facility, and Defendants ordered that cots be hidden and that patient charts be placed in a janitor's closet. At the time, Defendants were treating more patients than allowed by law and had patients sleeping in temporary cots rather than in licensed beds.

48. Absent accreditation, Defendants were not authorized to provide any patient care, and all of its DCS and TennCare reimbursements were fraudulently obtained.

### D. Additional DCS Violations

49. Defendants additionally violated its agreement with DCS to provide a safe and medically suitable environment for the DCS youth in its care.

50. Defendants allowed youth to undergo detoxification in the same area as adults, in direct violation of the DCS Policies and Procedures Manual and CRC's contract with DCS, resulting in some youth engaging in sexual intercourse with adult patients.

51. Defendants allowed youth from DCS' juvenile justice track to mix with youth from DCS' social services track, in violation of DCS' Policies and Procedures Manual and contract with CRC. Defendants' contract further required one staff member per five youth, but Defendants rarely provided that level of supervision for DCS' youth. As a result, youth conducted initiation rituals that included acts of violence and intimidation, such as beatings from

some youth against others and youth burning other youth with lighters. Many youth fled and were labeled "runaways" causing the youth to suffer additional repercussions.

52. DCS approved the CRC facility known as New Life Lodge to provide care for children classified as requiring Level 3 services, but relied on CRC to identify the level of care needed. CRC identified children as fitting the definitions of Level 3 even if the children were more appropriately categorized as requiring higher or lower levels of care, even if CRC's personnel informed CRC that such a designation was dangerous or inappropriate.

53. CRC contracted with DCS to provide educational services for the DCS youth in its care, but provided education services by a person who was not a licensed teacher and that were woefully inadequate to help the children remain on pace with their peers.

54. CRC was licensed to provide inpatient rehabilitation services to a certain number of youth, but billed and received reimbursement for more youth than its license allowed. CRC altered its census for program accountability reviews ("PAR") performed by DCS.

## X. Cederoth's Discovery of Illicit Practices and Defendants' Knowledge

55. Cederoth began her employment with CRC on or about March 1, 2007. She was employed to handle Defendants' accounts payable related to its operations in Tennessee. By 2008, Cederoth's duties included the creation and maintenance of a daily census of patients who were physically present at New Life Lodge, and to communicate those census numbers to other departments within New Life Lodge for the provision of food, laundry, physical plant, beds, etc.

56. In connection with her duty to assemble the daily census, Cederoth received information from both the clinical side of operations and from the billing side of operations, and realized that the numbers did not add up. She brought the discrepancies between the census

numbers and billing numbers to the attention of Defendants as early as 2008, and was advised that she could create separate census records for each side of CRC operations.

57. Cederoth refused to create a second set of books, and instead crafted an electronic program to facilitate communication between utilization review and clinical staff in 2009. She brought her concerns and solution to the attention of her supervisor, but her concerns were still ignored. She continued to complain that the census numbers were difficult to assemble because the underlying information did not match, and was allowed to present her solution to a new utilization review manager in 2010. However, her solution was never accepted, approved or implemented, and the underlying information never matched.

58. Cederoth witnessed increasingly deteriorating patient care during her time with CRC. On one occasion, she witnessed several patients lying on the floor outside of the medical office, and a nurse refused to provide the sick patients care, even after Cederoth personally requested that she do so. Instead, Cederoth was told that it was not medication time, and that she should concern herself only with paying bills.

59. In May, 2011, Cederoth agreed to serve as interim financial controller at New Life Lodge. She was asked to report revenue numbers from CRC Health Tennessee to regional financial management, and realized that the numbers were inflated and impossible. At that time, she also saw that the problems she had complained about persisted, and that she would be asked to take an active role in continued deceptions. She brought the discrepancies to upper management, and communicated via electronic correspondence with regional management about problems in the financial documentation. She was chastised for these efforts, and was instructed to cease her communications regarding the flawed census and accounting numbers. Cederoth was concerned that Defendants were fraudulently billing TennCare and DCS, and that it was

illicitly inflating its revenue numbers that were eventually reported to the public. Cederoth also learned that the same illicit practices extended to Defendants' recently purchased Recovery Living facilities, several intensive outpatient treatment facilities Defendants purchased in late 2010. Under this pressure, Cederoth resigned her position because she could not condone illicit practices that resulted in patient sickness and death as well as defrauding the state and federal governments and general public of millions of dollars.

60. Defendants own records clearly demonstrate the simple fact that they were billing for more beds than they were licensed to provide.

61. Defendants' controller and, upon information and belief, other corporate directors actively encouraged the modification of charts, requests for authorization, and internal documentation to maximize reimbursement. These individuals, for the benefit of Defendants, instructed staff to alter and even hide patient charts from auditors. Defendants knew its employees were not licensed to provide the services they purported to provide, particularly clinical counseling and youth educational services.

62. Additionally or alternatively, Defendants learned that its reimbursements were obtained as the result of false claims but have not disgorged the funds. Relator specifically provided information to Defendants sufficient to warrant a corporate audit of bookkeeping records to make the organization aware of the false claims, but no action was taken. Rather, Relator was chastised and pressured to keep the sloppy and fraudulent bookkeeping quiet.

### COUNT I: Federal False Claims Act—False Claims

63. Relator realleges and incorporates by reference the allegations of paragraphs 1-59.

64. This is a claim for treble damages and penalties under the federal False Claims Act.

65. Through the actions and inactions described above, Defendants have knowingly caused to be presented to the United States Government for approval and payment false and fraudulent claims by the State of Tennessee for federal matching funds under the TennCare program and for the State of Tennessee Department of Children's Services.

66. As a result of these false claims, the United States of America made payments that it was not obligated to make, suffered and continues to suffer damages in an amount that cannot yet be finally determined but which amounts to millions of dollars.

## COUNT II: Federal False Claims Act-False Records

67. Relator realleges and incorporates by reference the allegations of paragraphs 1-59.

68. This is a claim for treble damages and penalties under the federal False Claims Act.

69. Through the actions and inactions described above, Defendants have knowingly made, used and caused to be made and used false records and statements to get paid false or fraudulent claims by the State of Tennessee for federal matching funds under the TennCare program and for the State of Tennessee Department of Children's Services.

70. As a result of these false records, the United States of America made payments that it was not obligated to make, suffered and continues to suffer damages in an amount that cannot yet be finally determined but which amounts to millions of dollars.

## COUNT III: Tennessee Medicaid False Claims Act

71. Relator realleges and incorporates by reference the allegations of paragraphs 1-59.

72. This is a claim for treble damages and penalties under the Tennessee Medicaid False Claims Act.

73. Through the actions and inactions described above, Defendants have knowingly presented to the State of Tennessee for approval and payment false and fraudulent claims through the TennCare program.

74. As a result of these false claims, the State of Tennessee made payments that it was not obligated to make, suffered and continues to suffer damages in an amount that cannot yet be finally determined but which amounts to millions of dollars.

## COUNT IV: Tennessee False Claims Act

75. Relator realleges and incorporates by reference the allegations of paragraphs 1-59.

76. This is a claim for treble damages and penalties under the Tennessee False Claims Act.

77. Through the actions and inactions described above, Defendants have knowingly caused to be presented to the State of Tennessee for approval and payment false and fraudulent claims under the TennCare program and for the State of Tennessee Department of Children's Services.

78. As a result of these false claims, the United States of America made payments that it was not obligated to make, suffered and continues to suffer damages in an amount that cannot yet be finally determined but which amounts to millions of dollars.

WHEREFORE, Relator prays for judgment against Defendants as follows:

1. That the Court Order Defendants cease and desist from the illegal and fraudulent practices set forth herein;

2. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States of America and State of Tennessee has sustained

because of Defendants' actions, plus the maximum civil penalty allowable under the statutes cited herein for each false record or claim described herein;

    3.    That Relator be awarded the maximum amount allowed pursuant to the statutes cited herein;

    4.    That Relator be awarded all costs of this action, including attorney's fees and expenses; and

    5.    That Relator, the United States of America and the State of Tennessee be awarded such other relief as the Court deems just and proper.

Respectfully submitted,

/s/Mark J. Downton
Mark J. Downton, #20053
5654 Amalie Drive
Nashville, Tennessee 37211
615-275-6480
Email: markdownton@comcast.net

/s/Graham Prichard
Graham Prichard, #022980
P.O. Box 190432
Nashville, Tennessee 37219
(615) 279-1887
Email: graham@prichard.com